196

CRISTÓBAL RODRÍGUEZ GONZÁLEZ ET AL., Plaintiffs and Appellees, *v.* PONCE CEMENT CORP. ET AL., Defendants and Appellants.

No. R-67-208.      Decided December 30, 1969.

*Héctor Martínez Muñoz* for appellants. *César Andreu Ribas* and *Luis A. Lugo, Jr.,* for appellees.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

On a dark, rainy, and foggy night, a little over seven years ago, a deplorable accident occurred on State Highway No. 152, between Barranquitas and Comerío. The collision of a truck-trailer belonging to Ponce Cement Corporation with a tourist automobile driven by plaintiff-appellee resulted in the permanent incapacity of a professional person who lives an anodynous and hopeless life. To recover the damages inflicted the corresponding action was brought. Eyewitnesses of the accident were not presented. Plaintiff, mentally incapacitated, is not able to offer his version of the facts; defendants did not offer the truck-driver's testimony.[1] But this is not an insurmountable obstacle, as we shall see.

Relying exclusively on the testimony of a witness who arrived at the scene of the collision shortly after its occurrence and who described in detail the position of the vehicles, after the accident, and on the facts observed during an inspection or view which was performed, the trial court, through well-grounded inferences determined that the sole and exclusive cause of the accident was the negligence of the driver of the truck. It rendered judgment favorable to plaintiff for the total amount of $176,014.83 and included a pronouncement of $10,000 for attorney's fees. We agreed to review.

1. Relying on the absence of eyewitnesses, appellant stubbornly insists that it was not duly established by the proper evidence that the actions generating liability could be indefectibly attributed to the driver of the truck. Therefore, it is

---

[1] At the close of plaintiff's evidence, defendant-appellant announced that it would not offer evidence as to the occurrence of the accident. It had announced the driver of the truck, Cándido Coímbre Rivera, as witness.

We wonder why, in view of plaintiff's incapacity to testify, the deposition of the driver of the truck was not taken. Photographs of the scene of the accident or of the vehicles involved in the collision were not presented in evidence either.

necessary to make a recital of the pertinent facts which the court considered established and of the inferences derived therefrom.

The collision occurred in a stretch of the highway straight and level, comprised between kilometer 3.9 and kilometer 4 of the aforementioned highway, where under normal conditions there is complete visibility. But that night, the visibility was diminished by the falling rain and the fog over that area. The vehicles were traveling in opposite directions: that of plaintiff, going down, from Barranquitas to Naranjito; defendant's truck, going up from Naranjito to Barranquitas. Furthermore,

". . . the cars coming from said town [Naranjito] to Barranquitas cannot be seen until they are on the top of the slope at the very spot where kilometer 4 is marked [in this case, the truck]. Likewise, the cars traveling from Barranquitas to Naranjito [plaintiff's] cannot be seen by any person . . . when they pass k.4 because they start to go down the slope.

"In the stretch of the highway comprised between k.4 and k.3.9 where the accident occurred, and on the left-hand side from Naranjito to Barranquitas [direction of the truck] there is a red clay walk which is . . . more or less seven feet wide and a cliff from eight to ten feet deep.

"On the left-hand side in that same direction the walk is covered by vegetation and green grass more or less of the same width, but it ends in a slope about two feet over the level of the highway."

On the roadway, about 18 feet wide, no more than two cars going in opposite directions can travel.

According to the testimony of Ángel Santos, the position of the vehicles after the accident was as follows: that of plaintiff, in the direction it was traveling, from Barranquitas to Naranjito, "on its right-hand side, outside the road; the left-hand side tires did not touch even one foot of the pavement and the rest of the automobile was in the muddy part

of the roadway"; the truck was on its right-hand side in a slanting position.[2]

The left-hand side of plaintiff's vehicle was badly damaged: the damages started in the left-hand part of the grill and extended to the fender, the left-hand side door was dented, dents which went to the very lock; the steering wheel broken and bent; the left-hand front light off, but not the right light; the front left-hand tire, bent and turning toward the vehicle. The truck did not present any damage either to the cab or to the platform.

With this set of facts, in a noteworthy endeavor to reconstruct what actually occurred, the trial judge interpreted them, and by the reasoning set forth, he stated:

"The evidence showed that the trailer was traveling in the opposite direction to plaintiff's vehicle; that it was a rainy and foggy night; that the driver of defendant's vehicle was going up; that the road was muddy; that there was a cliff about eight or ten feet deep on the right-hand side of the driver of defendant's vehicle; that the latter's vehicle was a trailer or large, heavy truck. On the roadway only two vehicles going in opposite directions can travel. Plaintiff's car is a tourist car very much lighter than that of defendant. It was traveling along a stretch completely level. Upon receiving the impact it suffered damages mainly on all its lateral left-hand side, the door being dented and the steering wheel bent. After the impact it stopped at its extreme right-hand side, its front and rear left-hand tires only occupying one foot of the roadway, the rest of the vehicle was in the sand walk. The trailer, on the contrary, was in a slanting position in the road. As established in the findings of fact, in addition to the scarce visibility due to the fog the driver of the trailer could not see ahead of him until he had climbed to the top of the slope which he was ascending on his route to Barranquitas, and which ended right at the spot where kilometer 4 of said highway is.

---

[2] When a policeman went to the place to investigate the accident the truck-trailer was already parked on its right side. Driver Coímbre, had remained at that place while witness Santos took plaintiff to Barranquitas to offer him first aid.

"It is logical to infer that the truck, an extremely heavy and long vehicle was traveling in all probability along the center of the highway in view of the condition of precarious visibility and of the wet road. From these facts it may be inferred, also, that when the truck reached the top of the hill and entered the stretch comprised between kilometer 4 and kilometer 3.9 it suddenly came in front of plaintiff's vehicle whose right-hand lane the truck was occupying, at least, half of what corresponded to the former. Instantly Coímbre unsuccessfully tried to maneuver by swerving the truck to his right-hand side to prevent the impact. We are impressed by the fact that defendant's truck did not show damages on its front part. It is logical to infer that the damages caused to plaintiff's vehicle were not caused by the front part of the truck or trailer because it was prevented by the maneuver of the driver in swerving the truck. We can rather infer that the damages were caused by the truck platform and the latter, according to the evidence, was an iron platform. The position in which plaintiff's vehicle remained discards, in our opinion, the possibility of an inference or deduction that the accident could have been the result of a sideslip of said vehicle. A sideslip would have rather sent it against the truck instead of sending it to the position in which it remained, to its extreme right-hand side and almost entirely on the walk of the highway."

This is the weighing of the evidence challenged. Appellant's position seeks to arrive at the same result through three sources: (i) the impropriety of fixing the liability in the absence of evidence as to the manner in which the accident occurred, (ii) resorting to the so-called speculation and conjecture and (iii) the existence of other causal possibilities compatible with the set of facts set forth.

First, it should be noted that although the burden of the proof rests on plaintiff, he was not required that degree of proof, which, excluding the possibility of error, produces absolute certainty. The absence of direct evidence having been satisfactorily explained—due to the absence of disinterested eyewitnesses and to plaintiff's incapacity as a

consequence of the accident itself—this obligation could be performed by the presentation of indirect evidence, in this case, inferences. All that was required was the presentation of evidence in the light of which a reasonable person could be convinced that the wrongful act was due to defendant's fault. *Murcelo* v. *H. I. Hettinger & Co.*, 92 P.R.R. 398, 412–413 (1965), states the applicable rule as follows:

"We know that the party holding the affirmative of the issue must produce the evidence to prove it. Sections 1168 of the Civil Code and 108 and 162(5) of the Law of Evidence. However, as a general rule, the law does not require that degree of proof which, excluding the possibility of error, produces absolute certainty, because such proof—the law asserts—is rarely possible. Moral certainty only is required, or that degree of proof which produces conviction in an unprejudiced mind. It is not necessary to prove the case with mathematical exactitude through direct evidence, nor conclusively, nor produce such perfect degree of conviction as not to admit the possibility of opposing evidence. The litigant may prove his case through indirect evidence, which is of two kinds, inferences and presumptions. Inference is the deduction from the facts proved or fully established made by the trier in his discernment. Sometimes it is characterized as *hominis* presumption. That discernment represents an evaluating human activity of comparison or confrontation, an internal process which constitutes, in the opinion of professor Serra Domínguez, something unapproachable: the movement of man's reason.

"In this type of action plaintiffs, after presenting evidence in the light of which a reasonable person may be convinced that the wrongful act is due to defendant's fault or omission, are not bound to eliminate or exclude every other possible cause of the occurrence from which the required liability is derived. Even in the penal field, when The People only offers circumstantial evidence of guilt, such evidence need not be inconsistent with any reasonable hypothesis of innocence. *People* v. *Bonilla*, 78 P.R.R. 144 (1955)."

■ Precisely, plaintiff's evidence sought to comply with this rule. It established the physical characteristics of the

scene of the accident, the description and direction in which the vehicles were traveling, the position in which they remained after the collision, and the damages suffered by them. These facts permitted a rational and logical discernment of the manner in which the accident occurred. It was incumbent on the trier to make his findings from that evidence, the presentation of eyewitnesses not being absolutely indispensable.

■ The fact that the accident could have resulted from other causes is not sufficient by itself either to defeat the claim. It was only necessary that the trial court consider that the action or omission indicated by plaintiff was the most probable cause of the accident. *Cf. Sáez* v. *Municipality*, 84 P.R.R. 515 (1962). In this respect defendant argues that the accident could have occurred as a result of a sideslip of plaintiff's vehicle which forced the latter to abandon his course. But the trial judge wisely rejects this possibility stating: "A sideslip would have rather sent it against the truck instead of sending it to the position in which it remained, to its extreme right-hand side and almost entirely on the walk of the highway."

We are not convinced that we must alter the findings of the trial judge, who was also in a better position to draw the inferences, since he performed an inspection of the scene of the accident personally.

2. While José Colón Santini, Justice of the Peace of Barranquitas, who had investigated the accident for the purpose of fixing the criminal liability of the same was testifying, he said that six days after the occurrence of the collision,

"Coímbre Rivera [the driver of the truck] came accompanied by a man who said his name was Norberto Colón, who informed me that he came in representation of the Ponce Cement and that the latter would assume all liability. . . ."

Right afterwards the counsel for the defendant moved for

the elimination of the foregoing on the ground that plaintiff sought to vary the cause of action for a contractual obligation while the complaint was filed under the assumption of the Aquilian or extracontractual liability emanating from §§ 1802 and 1803 of the Civil Code, 31 L.P.R.A. §§ 5141 and 5142. Therefore, they invoked *Ramírez v. Gautier*, 87 P.R.R. 470 (1963). In the exposition of the objection to the admissibility they also referred to the absence of previous evidence on Colón's authority to bind defendant Ponce Cement Corporation by admissions, citing *Castro v. Hettinger & Co.*, 79 P.R.R. 834 (1957). In turn, the party bringing the evidence argued that it could be properly received since they were statements made in the presence of the driver of the vehicle, and as such, statements admitted by silence. At that time the trial judge indicated that it was admissible for the purposes indicated, "but, not at this moment, because it has not yet been established here who is Norberto Colón or in what capacity he went there," but not to vary the ground for the claim.

The witness added, without defendants' objection:

". . . when Norberto Colón told me that Ponce Cement would assume the liability, then Rodríguez González told me that he was not interested in the case and that he would bring suit against the insurance company; that then, as it is customary in these cases when the parties come to an agreement, I determined that the case was a fortuitous accident.

"·      ·      ·      ·      ·      ·      ·      ·.

"He [Norberto Colón] introduced himself to me as a representative of Ponce Cement.

"·      ·      ·      ·      ·      ·      ·

". . . he said, I come representing the company. . . ."

When it was sought to present in evidence a so-called certification issued by the Justice of the Peace at the request

of plaintiff Rodríguez,[3] objection was again raised as to the variation in the allegations. The court sustained it and refused to admit the certification on that ground, and also because it had not been established that Colón was authorized by the insurance company to enter into any agreement.

On cross-examination, upon questions aimed to obtain his explanation concerning his judicial determination, upon disposing of the investigation, that this was a fortuitous accident "due to the circumstances of the occurrence," [4] he stated:

"I was referring to the proposition made by Norberto Colón stating that his insurer would settle all the matter, it would answer for the damages and that, since the prejudiced party

---

[3] "I CERTIFY:

"That on November 20, 1962, I held the hearing of the investigation in relation to an automobile accident which occurred on State Highway No. 152 of Ward Quebradillas in Barranquitas between the vehicle (Trailer) driven by Cándido Coímbre Rivera and the vehicle driven by Cristóbal Rodríguez González. Facts which occurred on November 14, 1962.

"That in said hearing driver Coímbre Rivera was accompanied by Norberto Cólon, who informed that his presence there was due to the fact that he was the representative of the owners of the vehicle driven by Coímbre Rivera.

"That in view of Norberto Colón's allegation, who promised the prejudiced party, Rodríguez González, that his insurance company would answer for all the damages and other expenses which might be sustained by the latter, Rodríguez González made known his intention to litigate the case under the civil law against the insurance company and that therefore he was not interested in the case, for which reason I determined that the accident was a fortuitous accident in view of Norberto Colón's promise in the sense that the prejudiced party would be compensated for all the damages.

"Barranquitas, Puerto Rico, March 12, 1963.

"(Signed) José Colón Santini
            Justice of the Peace."

[4] "Fortuitous case. This is an accident between the vehicle driven by defendant (Trailer) and that of the prejudiced party, but after hearing the testimony of the prejudiced party, the latter says that he will bring the case for damages directly to the insurance company and that therefore he is not interested in the case. It is determined that this is a fortuitous accident because of the circumstances of the occurrence."

agreed to this with them, he would litigate with the insurance company."

He reiterated that he did not refer to the facts of the case in themselves, but rather to plaintiff's willingness to file the claim under the civil law.

Again, some days later, at the close of his evidence, plaintiff sought to offer in evidence the "certification" of the Justice of the Peace. The court ratified its view and did not receive it as evidence.

In his conclusions of law the trial judge stated:

"There is *additional* evidence that an officer of the Ponce Cement Corporation, identified as such, made statements before the Justice of the Peace in the presence of coplaintiff, of the police investigator, and of the driver, Coímbre Rivera himself, whom said officer was accompanying, in the sense that said enterprise assumed the liability for the damages suffered by Rodríguez. Those statements were offered six days after the accident. We can assume that codefendant, Ponce Cement Corporation, had investigated the accident. It is after having heard the statements made by the officer of the Ponce Cement that plaintiff notifies the Judge that he is not interested in the matter because it would be settled under the civil law and the judge then declared it a fortuitous accident. That is the usual and customary procedure. We understand that said conduct establishes an admission of liability by codefendant. It is necessary to point out that Coímbre Rivera, as well as Colón Garay, the officer of Ponce Cement who made the aforementioned statements, were in court."

Defendant moved for the reconsideration of the judgment and alleged, among other grounds, that the foregoing determinations were not supported by the evidence, since the court, during the trial, had sustained the objection to the admission, "of said evidence," referring to Judge Colón Santini's testimony. It stated that it possessed evidence to challenge said magistrate consisting precisely in the so-called certification issued by the latter, which plaintiff had unsuc-

cessfully tried to introduce in evidence.[5] The motion for the reconsideration was denied without making express reference to this contention.

In connection with this incident appellants assign that the trial court erred: (a) in taking into consideration, after the conclusion of the trial, evidence objected and excluded, depriving them of their right to cross-examination and to show that said employee (i) did not offer the statements attributed to him, (ii) was not authorized to offer such statements or admissions in the name of Ponce Cement Corporation and the insurance company; and (b) in failing to make reference, in the decision of the motion for reconsideration, to the documentary evidence admitted during the hearing of said motion, from which there appears that the Justice of the Peace had offered statements inconsistent with those adopted by the court in its findings.

From the recital of the incident in relation to the testimony of Judge Colón Santini there appears that the attestation of the statements made by employee Norberto Colón were only excluded insofar as they could have the effect of varying the cause of action, from the one grounded on negligence which supports the allegations, to the one of contractual origin. *Cf. Grindell* v. *Cities Delivery Express, Inc.*, 62 P.R.R. 126 (1943). For the same reason the "certification" issued by said judge at the request of plaintiff Rodríguez was not admitted. The court not having grounded its judgment on the *ex contractu* liability which could conceivably arise from

---

[5] It is assigned that the declaration at the trial to the effect that ". . . [they] the Ponce Cement Corporation, would assume all liability" and the statements in the certification in the sense that "Norberto Colón . . . promised . . . Rodríguez . . . that his insurance company would answer for all the damages and other expenses which might be sustained . . ." are contradictory.

We point out that the Ponce Cement Corporation as well as the insurer, United States Fire Insurance Company, were included as defendants.

employee Colón's action, appellants' challenge on this particular is untenable.

Now then, it seems that Colón's statements were admitted at first for the purpose indicated by one of the attorneys for the plaintiffs: to establish an admission by silence of the truck driver—who, by the way, was not included as defendant—but not as a direct admission of liability by the owner-enterprise or its insurer. Hence, the court, in entering its order stated, "The Court understands that the evidence, thus, for that sole purpose would be admissible; but, not at this moment, because it has not yet been established here who is Norberto Colón or in what capacity he went there." Later on, the same witness, without any objection whatsoever, identified Colón as a representative of Ponce Cement Corporation, according to his own statements, ". . . I come in representation of the company." Therefore, it can be understood that it was established that Colón was agent of the defendant enterprise, but there is no evidence whatsoever to support that the alleged admission of liability which may be inferred from his statements was comprised within the scope of the agency, that is, that Colón was authorized to offer it. It is thus required, subdivision 5 of § 35 of the Law of Evidence, 32 L.P.R.A. § 1678; *Castro* v. *Hettinger & Co.*, 79 P.R.R. 834 (1957); *Calderón* v. *Cacho*, 62 P.R.R. 593 (1943); 2 Jones, Law of Evidence, § 355 (1958 ed.). McCormick, On Evidence 519, § 244; 1 Conrad, Modern Trial Evidence, § 509; Schreiber, Trial Evidence in Civil Cases, pars. 20–3 and 21–12 (1969 ed.). *Portilla* v. *Carreras Schira*, 95 P.R.R. 785 (1968) and *Guzmán* v. *Ortiz*, 39 P.R.R. 170 (1929), are not applicable because they deal with direct admissions of liability made by the principal and not through an agent. In this sense the trial court erred in deciding that Norberto Colón's statements, brought by the testimony of Judge Colón Santini, established an admission of liability on the part of codefendant.

However, this error does not have the effect of requiring reversal of judgment. As it clearly appears from the findings of the trial judge, his principal ground to declare the truck driver liable of exclusive negligence is derived from the inferences he made from the evidence presented. Specifically, he referred to the so-called admission of liability as *"additional* evidence." The judgment is fully supported without any reference whatsoever to the admission, and consequently, it should prevail.

3. Lastly, appellant assigns that the trial court erred (a) in concluding that there is causal relationship between the accident and the injuries sustained by plaintiff, (b) in fixing the damages inflicted in the amount of $176,014.83, and, (c) in imposing the payment of the amount of $10,000 for attorney's fees.

(a) In failing to send here the transcript of the medical-experts' testimonies, appellant has failed to place us in a condition to weigh this assignment.[6] The detailed findings made by the trial court on this particular[7] give us the im-

---

[6] Appellant itself recognized the necessity of the transcript of evidence to support the commission of this error. It requested permission to attach it in order that we consider it for the issuance of the writ of review to which we agreed. Subsequently, it indicated that the availability of the appeal could be elucidated irrespective of the error concerning the causality of the injuries. We issued the writ. Pursuant to Rule 54.2 of the Rules of Civil Procedure, appellant did not designate to the trial court the portion of the oral evidence to be transcribed. The only pieces of the transcript of oral evidence were sent here as a result of steps taken by appellee for the discussion of the incident in relation to the admission of the statements made by Norberto Colón before Justice of the Peace Colón Santini.

[7] "17. . . . After he was taken care of in the Municipal Hospital he spent the night in Graciani's residence in Barranquitas, who took him the next day to his house in Villa Caparra.

"18. When his wife received him there he complained of acute headache. He had a bruise on one leg and a contusion on the nose and was very nervous. However, he changed his clothes and Graciani took him to the office to deliver the payroll and to report the accident. He returned before lunch and went to bed because he did not feel well and remained in bed

pression of a careful exercise of its function of weighing the evidence. It appears that the most probable cause of the injuries is of traumatic origin, and not hypertension, to which appellant's expert referred.

(b) The different elements of damages considered, in fixing the total award of $176,014.83, are the following:

during all that weekend.

"No doctor was called to take care of him. Apparently recovered Rodríguez returned to his work and worked during all the months of November and December, but during that time he suffered headaches and apparently a catarrhal condition which manifested itself by the dripping of a liquid substance through his nostrils which he attributed to pituita caused by common cold. Prior to December 24, he went to Texas and returned on January 7. Upon returning he complained of having suffered acute headache. The headache persisted during all the time before his condition became critical and he soothed it by taking aspirins. In that condition he continued working until April 1, 1963.

"19. On this date he left for Barranquitas in the exercise of his work. The next day, April 2, his wife was called from Graciani's house informing her that her husband was sick. His wife was accompanied by Dr. Arrillaga, her brother, and she went for him.

"When they arrived Rodríguez did not recognize them, he was in a serious condition, he talked incoherently. Then he did not have fever, but his temperature started to rise at 4:00 p.m. of that day.

"20. Dr. Rifkinson was called and the latter ordered his hospitalization at 11:00 p.m. The patient's condition was serious, the diagnosis was meningitis. He was confined in the hospital from April 2 to April 20 of the same year, when he was discharged. He continued treatment in his house and several neurological tests were made resulting in the discovery of an extraneous mass on the left temporal lobe. On May 9, 1963, he was confined again in the hospital and was submitted to an intracranial operation resulting in the removal of an intracerebral hematoma on the left temporal lobe of the brain. He was discharged on May 18 of that same year.

"21. During the course of the meningitis and the intracerebral operation and until the moment of the trial Rodríguez was taken care of and treated by neurosurgeon Dr. Nathan Rifkinson, who testified at the trial in the character of expert witness in that branch of medicine and as plaintiff's attending physician.

"Dr. Rifkinson testified at length on the origin of the meningitis suffered by Rodríguez as well as on the hematoma discovered in his brain. He also testified on the cause of both diseases.

"In the opinion of the court Dr. Nathan Rifkinson's testimony conclusively established that the meningitis as well as the hematoma were a

physical and moral sufferings of plaintiff Cristóbal Rodrí-
guez González, $75,000; sufferings and mental anguish of
his wife Concepción Arrillaga, $25,000; medical expenses ac-
tually incurred, $10,610.13, and "loss of earnings not received
by plaintiff by reason of the damages sustained and which
have incapacitated him permanently for work," $65,404.70.

consequence of the blow suffered by plaintiff on his forehead on the day
of the accident.

"22. It was also conclusively established that when Rodríguez received
the impact over that region he suffered a fracture of the cribriform plate
which split the dura producing the watery dripping which he was suffer-
ing during all the time after the accident and until April 1. This condition
was responsible for the entry of bacteria inside the membranes which
envelop the brain producing infectious inflammation of the membranes of
the brain which is commonly known as meningitis.

"In relation to the meningitis Dr. Rifkinson testified that conclusive
medical tests made during the treatment of Rodríguez had shown the
absence of such causes as blood infections, infections caused by penetrating
wounds, or infections of any other kind in different parts of the body, and
that the history of the symptoms shown by Rodríguez such as blows on
the head, contusion on the nose, hemorrhage of 'blood serum' through the
nostrils, recurring headaches, 'cold', rhinitis or 'pituita', and the use of
antibiotics, was significant.

"He explained that all this set of facts indicated that at the time of
the accident Rodríguez suffered the fracture of the cribriform plate, which
is a bone plate situated in the front base of the brain, behind the nose.
Fractures of this plate may be caused by blows received on any part of
the head, but mainly by those received in the area of the temporal lobes,
that is, the left-hand frontal side or the right-hand frontal side of the
head, or by blows on the nose. Generally this produces very fine fissures
in said plate through which the cerebrospinal fluid leaks and comes out
through the nostrils, and if, as a result of the blow the person bleeds
through the nose, then the mixture of the cerebrospinal fluid with the
blood gives the impression of 'watery blood.'

"The cerebrospinal fluid does not flow continuously, but rather its
discharge is stopped by small adhesions which temporarily or permanently
cover the fissures, but if the person sneezes or blows his nose the adhesions
are separated and allow the dripping of the cerebrospinal fluid which
then gives the impression of 'cold' or rhinitis. Through these fissures
germs can enter producing infections in the meninge and Dr. Rifkinson
mentioned having treated recurrent cases of meningitis where the cause
of the recurrency was the existence of fissures like the ones aforemen-
tioned.

"In the opinion of Dr. Rifkinson, Rodríguez' meningitis was due to
germs which had reached the meninge through the fissures caused by the

▇ Lost profit, recognized as an element of damages which must be considered in fixing the compensation, consists properly of loss of earnings caused to the person injured and the decrease of his earning capacity. The burden is on plaintiff to establish the loss of earnings up to the date of the hearing of the case, generally through the simple evi-

---

blow received in the accident of November 14, 1962.

"23. As to the cerebral hematoma the court understands that the expert evidence conclusively established that the same was the result of the injury or trauma received by Rodríguez on his forehead.

"In relation to this condition Dr. Rifkinson testified that by means of medical tests, the principal causes of said condition had been investigated and by elimination the most probable cause was that of the trauma on the head. Dr. Rifkinson stated that positively the result of the tests made to the patient had rejected such causes as the rupture of any intracranial aneurysm, rupture of weak blood vessels due to conditions such as arteriosclerosis, or to any other reason or as a result of hypertension. He pointed out that the most common cause of intracerebral hematomas was trauma on the head and that the existence of other causes having been eliminated, in his opinion, the intracerebral hematoma suffered by Rodríguez had been caused by the blows received in the accident of November 14, 1962, and that the history of symptoms presented by Rodríguez from the time he suffered the accident to his hospitalization corroborated it. He informed that these injuries commence with a slight hemorrhage from an intracerebral blood vessel as a result of the trauma on the head, and produce a latent condition consisting of a mass which grows slowly within the brain and until it is liquified some time later, this period varying in different persons and that in the case of Rodríguez it was about four months, which is reasonable.

"In the opinion of Dr. Rifkinson, Rodríguez has remained permanently incapacitated of his intellectual functions without probabilities of improvement in the future because the brain tissue is not reproduced and the affected areas remain so permanently. He also informed, that the eyesight of his patient had been permanently affected also and on this aspect he had been referred to Dr. Andrés Montalvo, who had examined and treated him as to that condition. He stated that the incapacity of his patient's mental abilities were of such a degree that the latter would never be able to practice his engineering profession again, nor any other profession requiring the use of reasoning and that he could not occupy any position of responsibility. He added that Rodríguez would be predisposed all his life to epileptic attacks and he would have to take anticonvulsive medicines. He ordered that Rodríguez should not appear in court because he was incapacitated and he ignored his true condition and was hopeful that someday he would be completely recovered. He pointed out also that his patient suffered from some kind of aphasia which affected his speech.

dence of the decrease thereof which may be attributed to causes originating from the accident; the decrease in earning capacity requires a prediction as to future impairment. There is no fixed rule for estimating the amount of the diminution of the earning capacity; at least three basic determinations are required: (a) the extent of the diminution in earning capacity, which is generally arrived at by comparing what the injured party was capable of earning before and after the accident; (b) the determination of the effects of the diminution, whether transitory or permanent; and (c) fixing the amount which compensates said diminution considering the extent as well as its effects, including the present net worth of the loss. It is not necessary that the evidence show with mathematical accuracy the damages caused on this account; a reasonable basis to permit a wise determination, not the product of speculation and conjecture, is sufficient. Annotation, *Sufficiency of Evidence, in Personal Injury Action, to Prove Impairment of Earning Capacity and to Warrant Instructions to Jury thereon*, 18 A.L.R.3d 88; 16 Am. Jur. Proof of Facts 701 *et seq.*, 22 Am. Jur.2d, Damages §§ 89–101.[8]

---

He indicated that in October 1963 he had referred his patient to a psychologist in relation to the speech problem.

"The evidence presented by defendant did not succeed in contradicting Dr. Rifkinson's testimony. Its only witness, medical expert Dr. James Arnold, Jr., a neurosurgeon from Baltimore, state of Maryland, testified after hearing Dr. Rifkinson's testimony and the latter's recital, and admitted that he had never seen or examined Rodríguez and that his testimony on that case was based on the examination of the medical record of the patient, as well as on the testimony offered by Dr. Rifkinson. Basically, Dr. Arnold's testimony agrees with Dr. Rifkinson's opinion except that in opposition to Dr. Rifkinson, Dr. Arnold stated that the most common cause of intracerebral hematomas was spontaneous hemorrhages of the brain blood vessels. However, he acknowledged that in a well-known medical work on the matter entitled *Injuries of the Brain and Spinal Cord and Their Coverings* the trauma on the head was pointed out as the most common cause of intracerebral hematoma."

[8] Generally, the mortality tables have been used to determine the duration of the period of incapacity. However, the work life expectancy

Although appellants do not specifically challenge the amount of $65,404.70 awarded for the diminution of the earning capacity, we are satisfied that the same is not unreasonable or arbitrary and that it was determined using the scarce elements of proof presented. If there is any objection it is that from plaintiff's annual income an amount representing the income tax, which he presumably had to pay, was deducted. The more general view supported by the majority of American cases reject this deduction in actions of personal injuries, Annotation, *Propriety of taking income tax into consideration in fixing damages in personal injury or death action*, 63 A.L.R.2d 1398, § 4[a]; *Income Tax as a Factor in Measuring Personal Injury Awards*, 8 Ark. L. Rev. 174 (1954); 16 NACCA L.J. 212 (1955). See, § 22(b) (5) of the Income Tax Act, 13 L.P.R.A. § 3022(b) (5).

As to the amount awarded for physical sufferings and mental anguish, all the attendant circumstances having been considered, we deem reasonable the amounts of $60,000 for plaintiff Cristóbal Rodríguez González and $15,000 for his wife Concepción Arrillaga; *cf. Widow of Fornaris* v. *Amer. Surety Co. of N.Y.*, 93 P.R.R. 28 (1966); *Jarabo* v. *Ramírez de Arellano*, 93 P.R.R. 691 (1966); *Widow of Seraballs* v. *Abella Hernández*, 90 P.R.R. 360 (1964).

Likewise, the amount of attorney's fees shall be reduced to $5,000.

Thus modified, the judgment of April 6, 1967 rendered by the Superior Court, Bayamón Part, will be affirmed.

Mr. Justice Rigau would affirm the judgment in its entirety and Mr. Justice Ramírez Bages would affirm the pronouncement of the trial court concerning the compensation

is more reliable. The difficulty is that the only table utilized for such purposes, called Smith-Griffin, is of limited value for having been computed considering only railroad employees. See *Work-Life Expectancy*, 26 Ins. Counsel J. 190 (1959).

awarded to Concepción Arrillaga Rodríguez. Mr. Chief Justice Negrón Fernández, Mr. Justice Hernández Matos, and Mr. Justice Torres Rigual did not participate herein.